**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

KATHLEEN A. INNES,

                    Plaintiff,

          -v-                                  1:22-CV-00641 (AJB/TWD)

COUNTY OF WARREN, *et al.*,

                    Defendants.

_____

**APPEARANCES:**                          **OF COUNSEL:**

TULLY RINCKEY, PLLC             ALLEN A. SHOIKHETBROD, ESQ.
Attorneys for Plaintiff
1203 Troy-Schenectady Road, Suite 101
Latham, NY 12110

ROEMER WALLENS GOLD &      EARL T. REDDING, ESQ
MINEAUX LLP
Attorneys for County Defendants
13 Columbia Circle
Albany, NY 12203

WARREN COUNTY ATTORNEY'S OFFICE    LAWRENCE ELMEN, ESQ.
Attorneys for County Defendants
1340 State Route 9
Lake George, NY 12845

DAVID S. SCHWARTZ LAW, PLLC      DAVID SCHWARTZ, ESQ.
Attorneys for CMC Defendants
30 Broad St – Ste FL 14
New York, NY 10005

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION & ORDER**

## I.    INTRODUCTION

Plaintiff Kathleen Innes ("plaintiff") brings this action against defendants Correctional Medical Care, Inc. ("CMC") and CBH Medical, P.C. ("CBH") (collectively, "CMC defendants") and defendant County of Warren ("Warren County" or "County"), alleging violations of the Americans with Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL").  Am. Compl., Dkt. No. 30.

Before the Court are defendants' motions for summary judgment.  Dkt. Nos. 83, 85.  For the reasons set forth below, the CMC defendants' motion will be **DENIED**, and the County's motion will be **GRANTED IN PART** and **DENIED IN PART**.

## II.    FACTUAL BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 Statements and their attached exhibits.  Unless otherwise noted, they are undisputed.

The CMC defendants were subcontractors for Warren County.  Pl.'s Resp. to County SOMF, Dkt. No. 90-1 ¶ 90.  CMC provided medical care for individuals incarcerated at the Warren County Correctional Facility ("WCCF"), and CBH provided behavioral health services. Dkt. No. 90-1 ¶¶ 39, 40.  In February 2017, plaintiff began working as a licensed master social worker for the CMC defendants.  *Id.* ¶ 32; Pl.'s Depo. 90-4 at 26.  Plaintiff worked out of the WCCF until she was fired, on April 6, 2018.  Dkt. No. 90-1 ¶¶ 34, 36.

In 2016, plaintiff was diagnosed with "anaphylaxis completed by angioedema," which causes occasional but severe allergic reactions.  Dkt. No. 90-4 at 88.  The trigger for these reactions is unknown.  *Id.* at 89.  During her time at WCCF, plaintiff suffered four severe allergic reactions.  Pl.'s Add'l SOMF, Dkt. No. 90-2 ¶ 25.  The first was on December 27, 2017, another

on February 22–23, 2018, a third at an unknown time, and the fourth on April 6, 2018, her last day of work.  Dkt. No. 90-4 at 59.

The morning of April 6, 2018, plaintiff experienced anaphylaxis while meeting with an incarcerated individual.  Dkt. No. 90-4 at 60; Pl.'s Resp. to CMC SOMF Dkt. No. 91-1 ¶ 13. After which, she informed her day-to-day supervisor, LPN Nichol King, that she was not feeling well.  Dkt. No. 90-4 at 60.  After self-administering epinephrine, plaintiff was taken by ambulance to the hospital.  *Id.* at 60–61.  A few hours later, plaintiff got a doctor's note clearing her return to work, and she went back to WFFC.  *Id.* at 61.  At about 2:00 p.m., plaintiff was informed by King that she was fired.  *Id.*  Plaintiff was not provided any specifics explaining why.  *Id.* at 53.

### III.    STANDARD OF REVIEW

Under Rule 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine factual dispute exists, and summary judgment is therefore inappropriate, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A fact is 'material' if "it might affect the outcome of the suit under the governing law[.]" *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 170 (2d Cir. 2023).  In reviewing the motion, the district court must "draw all reasonable inferences against the party whose motion is under consideration."  *Suluki v. Credit One Bank, NA*, 138 F.4th 709, 719 (2d Cir. 2025).  However, "[a] question of material fact does not exist merely because the plaintiff disagrees with the deposition testimony and documentary evidence produced by the defendant[s]."  *Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 355 (E.D.N.Y. 2023).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts[.]" *Felton v. Monroe Cmty. Coll.*, 747 F. Supp. 3d 603, 616 (W.D.N.Y. 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  Rather, the nonmovant "must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Michel v. Yale Univ.*, 110 F.4th 551, 560 (2d Cir. 2024) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

## IV.   DISCUSSION

Plaintiff claims that she was terminated by the defendants because of her disability, in violation of the ADA and NYSHRL.  *See, e.g.*, Am. Compl., Dkt. No. 30 ¶¶ 85, 97.

### A.  Employment Relationship

"To be held liable for employment discrimination under the ADA, a defendant must have been the plaintiff's 'employer.'" *Innes v. Cnty. of Warren*, 2023 WL 3601237, at *8 (N.D.N.Y. May 23, 2023) (Sannes, C.J.) (collecting cases).  Plaintiff is on notice of this requirement—the court previously assigned to this matter dismissed her original complaint for failing to allege an employer-employee relationship with *any* defendant.  *See id.* at 10 ("A complaint 'fails to satisfy the minimum standard' of providing the notice required under Fed. R. Civ. P. 8(a) where it 'lumps all the defendants together in each claim and provides no factual basis to distinguish their conduct[.]'") (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33 (2d Cir. 2001) (summary order)) (internal alterations omitted).

4

Following plaintiff's repleading, the CMC defendants sought dismissal of the amended Complaint, arguing once again that she "fail[ed] to sufficiently allege 'who [was] her direct employer, who [was] a joint employer, and who, if anyone, should be considered a single employer.'" *Innes v. Cnty. of Warren*, 2024 WL 865864, at *2 (N.D.N.Y. Feb. 29, 2024) (quoting CMC Mot. to Dismiss, Dkt. No. 36-1 at 9). Plaintiff responded that she "'adequately alleged' that 'Defendants were her 'employers' under the ADA,' that CMC Defendants and Warren County qualif[ied] as joint employers, and that 'Defendants CMC and CBH [were] intertwined and potentially alter-egos.'" *Innes*, 2024 WL 865864, at *2 (quoting Pl.'s Resp. to CMC Mot. to Dismiss, Dkt. No. 46 at 13–16).

"A single employer relationship exists 'where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a single employer.'" *Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411, 421–22 (S.D.N.Y. 2022) (quoting *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985)). "Four factors are used to determine whether an entity constitutes a single employer: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Bautista*, 642 F. Supp. 3d at 422 (citing *Radio & Television Broad. Technicians Loc. Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965)).

"Alternatively, a joint employer relationship 'may be found to exist where there is sufficient evidence that the respondent had immediate control over the company's employees.'" *Bautista*, 642 F. Supp. 3d at 422 (quoting *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994) ("*Solid Waste Servs., Inc.*")). "The essential question here is whether 'two or more employers exert[ed] significant control over the same employees . . . [or] where . . . it can be shown that they share or co-determine those matters governing essential terms and conditions of

employment.'" *Bautista*, 642 F. Supp. 3d at 422 (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982) ("*Browning-Ferris*")). "Courts may look to 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision,' in determining whether joint employer status is met." *Bautista*, 642 F. Supp. 3d at 422 (quoting *Browning-Ferris*, 691 F.2d at 1124).

The court previously assigned to this matter found that, at the motion-to-dismiss stage, plaintiff had "plausibly alleged facts supporting a single employer theory of liability with respect to CMC and CBH." *Innes*, 2024 WL 865864, at *6; *see id.* ("[T]wo CMC employees were involved in hiring Plaintiff, and one of those employees was her direct supervisor, Registered Nurse Nichol King") (citing Dkt. No. 30 ¶¶ 42–43)); *id.* ("On the day Plaintiff alleges she was notified of her termination, Plaintiff received a termination letter from a CBH human resources agent that contained a footer with the text 'c/o Correctional Medical Care, Inc.'") (citing Dkt. No. 30 ¶¶ 61–62; Dkt. No. 30-5); *id.* ("Later, when asked about the reason for Plaintiff's termination, the CMC Director of Human Resources indicated that 'we,' appearing to mean CMC, 'received communication from the Warren County Sheriff's Office' rescinding Plaintiff's security clearance.") (citing Dkt. No. 30-9; Dkt. No. 30 ¶ 67). The court added that, at that juncture, there was "no need to analyze whether Warren County employed Plaintiff jointly with CMC and CBH[,] as [the] County ha[d] not moved to dismiss[.]" *Innes*, 2024 WL 865864, at *6.

Discovery has closed, and defendants now move for summary dismissal.

The record clearly reflects that the CMC defendants were plaintiff's employer. Plaintiff was interviewed by Nichol King and Sherry Hillebrandt, both employed by the CMC defendants, one of whom offered plaintiff her position. Dkt. No. 90-1 ¶ 56. CMC provided plaintiff with orientation upon her hiring, and CBH provided plaintiff with an employee handbook. *Id.* ¶¶ 58,

68.  Plaintiff's supervisors were King and Jennifer Michaels, also an employee of the CMC

defendants.  *See id.* ¶¶ 52, 64.  King oversaw plaintiff's day-to-day schedule.  *Id.* ¶ 52; *see also*

*id.* ¶ 62 ("If [plaintiff] was going to be late or needed to leave early, she would advise Ms.

King."); *id.* ¶ 75 ("Scheduling was tasked by Ms. King."); *id.* ¶ 74 ("Ms. King spoke to Plaintiff

about her hours and required a more consistent schedule.").  Michaels oversaw plaintiff's social

work, having phone calls throughout the week with plaintiff to review inmates' mental health

statuses.  *Id.* ¶¶ 52, 63.  It was King who told plaintiff her employment was terminated.  *Id.* ¶ 96.

Plaintiff received her paychecks from CBH; she received no payment from the County.  *Id.* ¶¶

65, 71.  Plaintiff's health insurance was provided by the CMC defendants, and contributions

were deducted from her CBH paycheck.  *Id.* ¶ 73.  Her W-2s came from CBH, not the County.

*See id.* ¶¶ 70, 72.

Whether the County qualifies as plaintiff's joint employer is another matter entirely and

remains an open question.  Of course, the County asserts that it has never been plaintiff's

employer, joint- or otherwise.  *See* Warren County's Mot. for Summ. J., Dkt. No. 83-17 at 10–15.

"It is axiomatic that, in order to be liable for employment discrimination . . . , an entity must have

been the complainant's employer."  *Conde v. Sisley Cosms. USA, Inc.*, 2012 WL 1883508, at *2

(S.D.N.Y. May 23, 2012) (Title VII claim); *see Rullan v. New York City Dep't of Sanitation*, 2011

WL 1833335, at *7 (S.D.N.Y. May 12, 2011) (holding no liability under ADA and Title VII

where government defendant "was not Plaintiff's employer").

Plaintiff asserts that "the County was involved in Plaintiff's hiring process[,] [and] its

employees directed and instructed Plaintiff on how to perform the duties of her position [and]

issued 'counselings' to Plaintiff[.]"  Pl.'s Resp. to County's Mot. for Summ. J., Dkt. No. 90 at 7;

*see* Dkt. No. 30 ¶¶ 43–44 ("CMC Entities, RN King and the CMC Regional Manager [Sherry

Hillebrandt] interviewed Plaintiff for the advertised position of Licensed Master Social Worker at WCCF.  Shortly thereafter, Plaintiff was recommended to the next round for an interview with WCCF, Inspector Barboza. [sic].  Inspector Barboza[,] [a County employee,] was responsible, in part, for Plaintiff's hiring and termination and was involved in communicating and coordinating with Plaintiff to ensure compliance with rules, regulations of the facility, and to address safety concerns for inmates under Plaintiff's supervision.").

Although their conversation appears to have been brief, the record reflects that at least some portion of plaintiff's interview was conducted by Inspector Barboza, and that Barboza communicated what she expected of plaintiff, were she to get the job.  *See* Pl.'s Depo., Dkt. No. 90-4 at 14 ("Q: [W]ith whom was the interview held?  A: At first it was with Nichol King and Sherry [Hillebrandt], and then at the end of that the inspector, Barboza came in.  A: How long was your interview with Nichol King and Sherry?  A: I cannot recall.  Q: How long was your interview with all three of them in the room?  A: I cannot recall if all three were in the room.  I cannot recall how long it was for."); *id.* at 15–16 ("Q: And when Investigator Barboza came into the room, what was discussed with her?  A: My experience expectations [sic] of both myself and the facility[.]"); *id.* at 22 ("Q: What did Investigator Barboza say to you when she came in during that interview?  A: She also stated what my responsibilities would be.  Q: What did she state?  A: That my responsibilities was to address the incarcerated individuals' mental health needs while I worked there.").

Plaintiff also testified that Inspector Barboza "would tell [her] how to perform aspects of [her] job[.]"  Dkt. No. 90 at 17; *see, e.g.*, Dkt. No. 90-4 at 138–39 ("Q: Did Inspector Barboza ever tell you how to do your job?  A: Yes.  Q: And in what ways[?]  A: She would tell me, Go see this person."); *id.* at 139–40 ("Q: And how would it come about that she would tell you to go see

that person?  A: There would have been a mental health concern.  Q: So she would tell you to go see that person regarding the mental health concern?  A: Correct.").  Moreover, the record reflects that Inspector Barboza sought to enforce certain behavioral and dress standards on plaintiff and dictate plaintiff's behavior both on and off premises.  *See* Oct. 12 Hillebrandt Email, Dkt. No. 90-15 ("The inspector has spoken to Nichol in the past regarding [plaintiff's] wardrobe and then her behavior in the jail.  Last week the inspector spoke to Nichol regarding [plaintiff's] posting on her Facebook page[.]  They also feel that she speaks disrespectful to the officers. [F]acebook is becoming an area that is monitored by a lot of employers not just Warren jail.  The Sheriff takes this behavior very seriously.  [Plaintiff] has a target on her back right now[.]").  Inspector Barboza also appears to have played at least some role in plaintiff's termination.  *See e.g.*, Pl.'s Depo., Dkt. No. 83-3 at 135–36 (testifying that plaintiff was escorted off the premises by Inspector Barboza when she was fired).

Further, plaintiff alleges that the County was her joint employer because it revoked her security clearance.  *See* Dkt. No. 90 at 17 ("The Sheriff has control over whether a contracted individual could be in its correctional facility[.]  Without a security clearance, a provider, like Plaintiff, is not to be in the correctional facility.").

Defendants are parties to a Health Services Agreement ("HSA").  *See* Dkt. No. 90-1 ¶ 37; Health Services Agreement, Dkt. No. 83-10.  The Agreement provides that CMC and CBH are independent contractors of the County and "[n]othing in th[e] Agreement is intended nor shall be construed to create an agency relationship, an employee/employer relationship, or a joint venture relationship among the parties."  Dkt. No. 83-10 at 16; Dkt. No. 90-1 ¶ 48.  It also states, "[i]f the Sheriff becomes dissatisfied with any Providers . . . for reasons other than those relating to their professional judgment, the Medical P.C. or Dental P.C., [i.e., CMC or CBH] as applicable, shall,

in recognition of the sensitive nature of correctional services, following receipt of written notice from the Sheriff of dissatisfaction and the reasons therefor, exercise its best efforts to resolve the problem." Dkt. No. 83-10 at 6. "If the problem is not resolved satisfactorily to the Sheriff, the Medical P.C. or Dental P.C., as applicable, shall remove the Provider." *Id.*

Yet, it is not merely that Sheriff York revoked plaintiff's clearance, and that action had the incidental effect of leading to plaintiff's termination by the CMC defendants. Rather, evidence in the record suggests that the Sheriff directed the firing of plaintiff and it was the revocation of her security clearance that was an incidental effect of her termination. *See* Hillebrand Apr. 3 Email, Dkt. No. 83-13 at 1 ("Hi Everyone: I must tell you that the Warren County Sheriff has asked us to terminate the full time SW Kathleen Inness. He is pulling her security clearance as of Friday."); *cf.* Sunday Depo., ("But yeah, the Sheriff can always make a request to [the CMC defendants to] terminate an employee and then we try to work with them, they are our client. But it's not necessarily a hard and fast decision[—]unless they pull their security clearance, which obviously is their trump card.").

"A joint employer relationship may be found to exist where there is sufficient evidence that one entity had immediate control over the other company's employees[.]" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 89 (2d Cir. 2005) (quoting *Solid Waste Servs., Inc.,* 38 F.3d at 94) (internal alterations omitted). Relevant factors may include—but are not limited to—the following: (1) the power to hire and fire employees, (2) supervision and control over employee work schedules or conditions of employment, (3) determination of the rate and method of payment, and (4) the maintenance of employment records. *See Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 67 (2d Cir. 2003) (citing *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) (borrowing factors from *Bonnette v. Cal. Health & Welfare Agency,* 704 F.2d 1465, 1470

(9th Cir. 1983)); *see also New York v. Scalia*, 490 F. Supp. 3d 748, 788 n.24 (S.D.N.Y. 2020)

("Indeed, the [Defendant's] test [for determining joint employment] is even narrower than the

*Bonnette* factors, which courts have rejected as 'unduly narrow.' [] *Bonnette* held that the *power*

to hire and fire the employees was relevant to the joint employment analysis.  But the Final Rule

requires that the putative employer 'hires or fires the employee.'  If *Bonnette*'s four factors are

impermissibly narrow, a narrower test is also inadequate.").

Construing the record in the light most favorable to plaintiff, the Court finds that genuine

issues of material fact exist as to whether the County was plaintiff's joint employer, precluding

summary judgment on that ground.

## B.  Merits of ADA Claim

Nevertheless, defendants maintain that they are entitled to summary judgment on

plaintiff's ADA claim, arguing that record evidence is insufficient to establish that they

discriminated against plaintiff based on her disability.  *See* Dkt. No. 83-17 at 16–18; Dkt. No. 85-

1 at 5–9.  Plaintiff alleges that defendants discriminated against her, in violation of Title I of the

ADA, by wrongfully terminating her employment because of her disability.  *See* Dkt. No. 30 ¶¶

76–89 (labeled "Count I Against Defendants — Violation of the ADA, Disability

Discrimination); *id.* ¶ 18 (acknowledging Title I governs claims).  Concurrently, she also alleges

that defendants discriminated against her on the basis of her disability in violations of the New

York State Human Rights Law.  *See* Dkt. No. 30 ¶¶ 90–101.

"The analysis for ADA and NYSHRL claims is nearly identical."  *Pepe v. Cnty. of

Suffolk*, 2025 WL 2549986, at *5 (E.D.N.Y. Sept. 4, 2025) (citing *Casseus v. Verizon N.Y., Inc.*,

722 F. Supp. 2d 326, 350 (E.D.N.Y. 2010)).  Therefore, "[p]laintiff's claims of disability

discrimination under the ADA and the NYSHRL [will be] examined under the same standards." *Ingram v. Nassau Health Care Corp.*, 2019 WL 1332857, at *4 (E.D.N.Y. Mar. 25, 2019).

Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). Under this framework, a plaintiff bears the initial burden of proving their prima facie case of discrimination by a preponderance of the evidence. *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 457 (S.D.N.Y. 2023).

To establish a prima facie case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). Specifically, a plaintiff must satisfy the last element of her prima facie case by showing that the adverse employment action "occurred under circumstances giving rise to an inference of discrimination." *Verne v. N.Y.C. Dep't of Educ.*, 697 F. Supp. 3d 30, 44 (S.D.N.Y. 2023) (quoting *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020)).

"If the plaintiff establishes a *prima facie* case, and if the defendant then proffers a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual." *Carter v. TD Bank, N.A.*, 2023 WL 3818589, at *13 (D. Conn. June 5, 2023) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999)).

"The plaintiff will ultimately prevail on [her] ADA discrimination claim only if [s]he proves that [her] disability was 'the but-for cause' of the adverse employment action." *Carter*, 2023 WL 3818589, at *13 (citing *Natofsky v. City of N.Y.*, 921 F.3d 337, 349 (2d Cir. 2019)).

It is not reasonably in dispute that plaintiff is covered by the ADA or that her termination qualifies as an adverse employment action. *See Perez v. New York Presbyterian/Weill Cornell Med. Ctr.*, 2024 WL 1514216, at *5 n.7 (S.D.N.Y. Apr. 8, 2024); *Bonnen v. Coney Island Hosp.*, 2017 WL 4325703, at *11 (E.D.N.Y. Sept. 6, 2017), *report and recommendation adopted,* 2017 WL 4296733 (E.D.N.Y. Sept. 26, 2017).  Viewing the evidence in the light most favorable to plaintiff,  a rational factfinder could conclude that plaintiff's termination took place under circumstances giving rise to an inference of discrimination.  *See* Pl.'s Resp. to CMC Mot. for Summ. J., Dkt. No. 91 at 10–14.

As a result, "defendant[s] must produce evidence supporting an explanation for the termination which, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 132 (E.D.N.Y. 2023) (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000)).

"[T]he defendant[s] need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 78 (N.D.N.Y. 2020) (Hurd. J.).  "[T]his burden is one of production, not persuasion; it can involve no credibility assessment." *Musante v. Mohawk Valley Cmty. Coll.*, 270 F. Supp. 3d 564, 577 (N.D.N.Y. 2017) (Hurd, J.); *see also Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) ("[W]hile the presumption shifts the burden of production to the defendant, the ultimate burden of persuading

the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal alterations and citations omitted).

"An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Altman v. New Rochelle Pub. Sch. Dist.*, 2016 WL 3181153, at *4 (S.D.N.Y. June 2, 2016) (quoting *DeLuca v. Allied Domecq Quick Serv. Rests.*, 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006)).  "[C]ourts have consistently held that they may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by discrimination.  Federal courts do not hold a roving commission to review business judgments."  *Peters v. Mount Sinai Hosp.*, 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989)).

**(i)  The CMC defendants**

The CMC defendants offer Sheriff York's revocation of plaintiff's security clearance as their sole legitimate, non-discriminatory reason for her termination.  Dkt. No. 90-1 ¶ 95.  They offer *Forrester v. Prison Health Services* as a "factually similar case, [in which] the Second Circuit . . . ruled that the revocation of an employee[']s security clearance is a legitimate, non-discriminatory reason for termination."  Dkt. No. 85-1 at 6–7 (citing *Forrester v. Prison Health Services*, 651 F. App'x 27 (2d Cir. 2016) (summary order).  In *Forrester*, the correctional facility's indefinite suspension of the plaintiff's security clearance occurred only *after* a review of her work email account—conducted by her employer, Prison Health Services (i.e., Corizon Health, Inc.)—"revealed . . . emails forwarding sensitive, confidential information, including prisoner location and gang affiliations, from her work account to her home email address."

*Forrester v. Prison Health Servs., Inc.*, 651 F. App'x 27, 29 (2d Cir. 2016) (emphasis added). The Court fails to see any similarity between *Forrester* and the facts (or, perhaps more accurately stated, lack of facts) presented here.

At bottom, the CMC defendants' position is this: Without clearance, plaintiff could not work at WCCF. Sheriff York revoked plaintiff's clearance. Therefore, the CMC defendants had no choice but to fire plaintiff.

The flaws in this logic are obvious. The CMC defendants act as though they were powerless—that they were bound by some immutable external force to fire plaintiff. They were not.

First, the County was not the CMC defendants' sole client. *See* CBH Employee Handbook, Dkt. No. 90-17 at 36 ("Due to the nature of our industry, security clearances are required by *all* the facilities we service.") (emphasis added). And WCCF was just one of the facilities they had workers placed. Dkt. No. 85-1 at 7 ("[E]mails show CMC/CBH personnel . . . consider[ing] paying their social worker at the Schenectady facility a little extra to take some inmates at WCCF[.]"); *see also* CMC Defs.' SOMF ¶ 12 ("At the time of Plaintiff's termination, CBH was still short-staffed."). The CMC defendants do not assert that plaintiff, at the time her clearance was revoked by WCCF, could not be placed elsewhere. *See* Dk. No. 85-2 ¶ 39. Rather, they state only that "CBH's corporate designee[,] Shane Sunday, testified that at the time . . . there were no other facilities that CBH contracted with that had a vacancy for a social worker where Plaintiff could be placed." *Id.* That statement's qualifiers and its lack of substance warrant pause—as does Sunday's testimony itself. *See* Sunday Depo., Dkt. No. 85-6 at 123 ("[B]ut I'm sure they reviewed the staffing to see *if there was a need*. Social workers are not easy to find. So, you know, if there was a place to put her, they *probably* would have looked at

it, but given that the facilities *in the area* were all fully staffed, there *probably* wasn't an opportunity to do so.") (emphases added). A genuine issue of material fact exists as to whether circumstances forced the CMC defendants'' hands, or if plaintiff could have continued working for them elsewhere or in another capacity.

Second, the CMC defendants' purported obligation to fire plaintiff was based on their own internal, inexplicably axiomatic policy. The CMC defendants emphasize that their employee handbook states: "[I]f a facility should revoke an employee's security clearance, [the CMC defendants] will have to terminate the employee." CMC Defs.' SOMF, Dkt. No. 85-2 ¶ 2.

Certainly, the document states plainly that, "[s]hould a facility revoke an employee's security clearance, *for any reason*, CBH Medical will have no choice but to terminate the employee." CBH Employee Handbook, Dkt. No. 90-17 at 36 (emphasis added). However, it also notes an important caveat—such termination is permitted "provided there is no violation of applicable federal or state law." *Id.* at 9; *see also id.* ("CBH Medical complies with applicable state and local laws governing non-discrimination in employment in every location in which it has employees. This policy applies to all terms and conditions of employment including, but not limited to, recruitment, hiring, training, promotion, compensation, benefits, transfer, disciplinary action, and leaves of absence.").

And yet the CMC defendants insist, "Any claims that the security clearance was unlawfully revoked, whether because of discrimination or some other reason, can be directed only against the County as the entity that had the sole authority to take such action." *See* Dkt. No. 97 at 4. "Whether the County's views on Plaintiff's behavior were unlawful, pretextual, discriminatory, or otherwise, it is irrelevant to the issue of CMC/CBH's liability." *Id.* at 5.

That is simply not true.  "An employer is not necessarily shielded from liability by the fact that a third-party engaged in the discriminatory practices that form the basis for an employee's suit against the employer."  *Equal Emp. Opportunity Comm'n v. Cummins Power Generation Inc.*, 313 F.R.D. 93, 99–100 (D. Minn. 2015) (collecting cases).

A reasonable jury could find that the revocation of plaintiff's clearance was motivated by discriminatory animus.  If the CMC defendants directed such a discriminatory act, enabled it, or even just knew of the underlying animus and did nothing to stop it—then proceeded to use that revocation to justify firing plaintiff—a reasonable jury could undoubtedly find they violated the plaintiff's rights under the ADA and NYSHRL.  It remains to be determined what the defendants' employment relationships with plaintiff were, what their respective involvement in her termination consisted of, and what served as the basis for her termination.  Summary judgment in the CMC defendants' favor is, therefore, precluded.

**(ii)  The County**

The County stands resolute in its assertion that plaintiff was never its employee.  *See, e.g.*, Dkt. No. 83-17 at 16 ("Plaintiff is unable to establish that the County is an employer."); *id.* ("The County did not terminate Plaintiff's employment. [H]er employment was terminated by CBH on April 6, 2018.").  It thus provides no basis one way or another for terminating plaintiff.  Instead, the County's brief primarily consists of arguing that its revocation of plaintiff's security clearance was permissible.  But, as the County acknowledges, the adverse employment action at issue in this case is plaintiff's termination—not the revocation of her security clearance.  *See* Dkt. No. 83-17 at 16 ("Under the familiar burden-shifting framework, Plaintiff must come forward with sufficient facts to establish a prima facie case that her termination was effected

under circumstances giving rise to an inference of discrimination.").[1]  Though potentially

entwined, the two acts are not one in the same.  Therefore, the Court declines to treat them as

such.  The County offers no rationale for terminating plaintiff, and the Court will not provide any

on its behalf.

Even were the Court to consider the County's rationale, they are insufficient to warrant

dismissal of this action.  The limited record before the Court suggests that Sheriff York served as

an impetus for plaintiff's termination.  Certainly, the record also reflects several legitimate,

nondiscriminatory bases that *could have* justified Sheriff York's decision to terminate plaintiff.

*See, e.g.*, Dkt. No. 83-15 (Barboza Memo to Sheriff York detailing March 9, 2018, reprimand of

plaintiff for allegedly failing to follow security protocol); Dkt. No. 83-16 (Barboza Apr. 2 email

to plaintiff regarding proper procedure for inmate medical requests); King Depo., Dkt. No. 90-9

at 94–95 ("A: [I]f you want to focus on Kathleen, I remember having conversations with Sheriff

York about someone reporting to him at one point in time an argument between Kathleen and

another nurse in my department that I had to explain to him what happened.  I had to have

conversations that officers were upset about Kathleen overstepping her bounds as a social worker

with the inmates.  I have had conversations with the sheriff, or the captain, or the sergeants about

overhearing her discussing things that she should not be discussing with inmates[.]"); Dkt. No.

90-9 at 100 ("A: [S]he would have arguments in the facility with her significant other[.]  Q: And

---

[1] Peculiarly, the County even claims that it "was not aware that Plaintiff had a disability." Dkt. No. 83-17 at 17.  However, evidence in the record suggests that there exists, at minimum, a genuine issue of material fact as to the County's awareness.  *See* King Depo., Dkt. No. 90-9 at 98 ("Q: And why would you report that to the sheriff? A. [T]hey probably came to me and said, you know, what is going on with her? Why is there an ambulance here? Is there an issue, you know? It's in their facility."); *id.* ("I would have to report [plaintiff's disability] to corrections and the sheriff because I had to ask permission to have her medications and EpiPen brought into the facility.").

who was that?  A: One of them was one of my nurses, and she was in a relationship with . . . [a] Sergeant[.]"); Dkt. No. 90-9 at 102 ("A: [I] would hear from corrections that . . . they were in a meeting in their sergeant's office, and she would barge in in the middle of it, thinking she could sit down in the middle of their meetings.").

However, there is nothing before the Court indicating Sheriff York's motivations one way or another.  The Sheriff's communications from the time that are presently offered to the Court provide no insight into his reasoning.  *See* York Apr. 5 email, Dkt. No. 90-13 at 1 (From Bud York to Nichol King— "Nicole: Per our many conversations about Kathleen, I am hereby rescinding her security clearance as I no longer want her working in this facility.  Should you need anything further please advise.").

And York's testimony sheds no light—in fact, he claims to have no memory of plaintiff. *See, e.g.*, York Depo., Dkt. No. 90-6 at 37 ("Q: Do you know the Plaintiff, Kathleen Innes? A: I have no recollection of her whatsoever."); *id.* at 37–38 ("Q: Sir, you have no recollection of the plaintiff in this case?  A: I have no recollection of her whatsoever."); *id.* at 38 ("Q: Do you recall ever having interactions with her?  A: I do not."); *id.* ("Q: Do you recall whether she worked at the Correctional Facility?  A: No recollection.  Q: In 2017?  A: No recollection.  Q: While you were Sheriff?  A: No recollection.  Q: In 2018?  A: No recollection. Q: While you were Sheriff? [sic]  A: No recollection."); *id.* at 49–50 ("Q: Your email on the bottom here says, 'Nichol, per our many conversations about Kathleen, I am hereby rescinding her security clearance, as I no longer want her working in this facility. Should you need anything further, please advise.'  Did I read that right?  A: Yes, sir.  Q: How many conversations did you have with Ms. King?  A: I have no recollection.  Q: Well, here it says, "many," correct?  A: Yes.  Q: And that would be more than

19

one; is that right?  A: Yes.  Q: And you have no recollection of any of those conversations?  A: Zero.").

Plaintiff's prima facie case is thin.  However, the County's argument starts and stops with an insistence that it was not her employer.  But a rational jury could reasonably infer that Sheriff York and Inspector Barboza were, at various points, personally involved in the oversight of plaintiff, the deliberation and processing of her termination, and otherwise governed essential terms and conditions of her employment.  Since the County offers no other apparent arguments against plaintiff's prima facie case of disability discrimination, as weak as that case may seem, the Court concludes that it has been established, thereby precluding summary judgment on her ADA claim against the County.

### C. Plaintiff's NYSHRL claim against the County

The same cannot be said of plaintiff's state law claim.  The County argues that plaintiff's state law claim must be dismissed for failure to comply with the notice-of-claim requirements of New York County Law § 52.  *See* Dkt. No. 83-17 at 8–10.  "County Law § 52 requires the filing of a notice of claim for claims 'against a county for damage, injury or death, or for invasion of personal or property rights, of every name and nature[.]'"  *Id.* (quoting N.Y. County Law § 52). "The general rule in federal court is that state notice-of-claim statutes apply to state-law claims." *Id.* (internal citations omitted).  "The notice of claim requirements set out in County Law Section 52 do generally apply to New York State Human Rights Law Claims for employment discrimination and retaliation against a county."  *Bidot v. Cnty. of Suffolk*, 2025 WL 1135049, at *15 (E.D.N.Y. Mar. 7, 2025) (internal citations omitted).

County Law § 52 "incorporates the notice of claim requirements contained in [New York] General Municipal Law §§ 50-e and 50-i", and "broadens their scope."  *Kuiken*, 669 F. Supp. 3d

20

at 131 (quoting *Cooper Crouse-Hinds, LLC v. City of Syracuse, N.Y.*, 2018 WL 840056, at *10 (N.D.N.Y. Feb. 12, 2018).  Under General Municipal Law § 50-e, "a plaintiff who asserts a state law [] claim against a municipal entity must file a notice of claim within ninety days after the incident giving rise to the claim."  *Id.* (citing *Endemann v. City of Oneida, N.Y.*, 2020 WL 1674255, at *6 (N.D.N.Y. Apr. 6, 2020)).  "Notice of claim requirements 'are construed strictly by New York state courts, and failure to abide by their terms mandates dismissal of the action.'" *Bidot*, 2025 WL 1135049, at *15 (quoting *Am. Tel. & Tel. Co. v. N.Y.C. Dep't of Human Res.*, 736 F. Supp. 496, 499 (S.D.N.Y. 1990)).

Plaintiff maintains she has met these requirements.  "[S]ix (6) days after her termination, Plaintiff submitted a Freedom of Information Law ("FOIL") request to the County, seeking copies of records relating to documentation as to the cause of loss of her security clearance[.]" Dkt. No. 90 at 12 (citing Pl.'s Ex. H, Dkt. No. 90-11).  "On that same date, the County, through Major James A. LaFarr, responded to that request."  *Id.*  "In e-mail correspondence concerning the FOIL request, LaFarr wrote to Plaintiff[:] ' Your separation from employment is from CMC. Any questions you have about that should be directed to their staff, not the Warren County Sheriff's Office[;] [w]hen an employe[e] of CMC is terminated their security clearance is automatically pulled.'"  *Id.* at 12–13 (citing Pl.'s Ex. I, Dkt. No. 90-12).

Plaintiff concludes that "[b]ased on the nature of the FOIL request, and LaFarr['s] response concerning [her] termination of employment, specifically referencing that any questions be directed elsewhere, and not to the County, it is abundantly clear that the County had notice of Plaintiff's claims."  *Id.*

This argument lacks merit.  "[N]otice shall be in writing, sworn to by or on behalf of the claimant, and shall set forth: (1) the name and post-office address of [the] claimant, and of [her]

attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the items of damage or injuries claimed to have been sustained so far as then practicable[.]"  N.Y. Gen. Mun. Law § 50-e.  The only thing "abundantly clear" about plaintiff's correspondence with LaFarr is that it fails to meet the law's notice requirements.  *See* Dkt. No. 90-12 at 1 ("Major LaFarr: Thank you for your prompt response to my FOIL request.  I am sorry to have to get you involved.  I had tried to get an explanation of my loss of Security Clearance from my supervisor[.]").

"Regardless," plaintiff asserts, even if her notice was deficient, "the County should be equitably estopped from raising [the] purported failure to serve a notice of claim at this late stage in the proceeding."  Dkt. No. 90 at 13.  "The County previously moved to dismiss, raising other procedural concerns with Plaintiff's filing, but failed to further a notice of claim defense."  *Id.* at 14.

True, the County moved for, and was granted, dismissal of plaintiff's original complaint.  *See* Dkt. Nos. 15, 28.  But plaintiff subsequently filed the operative amended complaint.  *See* Dkt. No. 30.  The County promptly answered two weeks later.  Included among its defenses: plaintiff's failure to serve notice.  *See* County's Answer, Dkt. No. 32 ¶¶ 107–08 ("Plaintiff did not serve a notice of claim upon the County[,] [as] required to do so pursuant to County Law Section 52 and General Municipal Law Section 50[.]").  The County's "asserti[on] in [its] answer was sufficient to raise as an affirmative defense plaintiff's failure to comply with the notice of claim requirement."  *Roland v. City of N.Y.*, 2024 WL 2832691, at *11 (S.D.N.Y. June 3, 2024).

"The burden is on the plaintiff to demonstrate compliance with the Notice of Claim requirement."  *Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 448 (E.D.N.Y. 2012) (internal

citations omitted).  Plaintiff has not met her burden.  Consequently, the Court will dismiss plaintiff's state law claim against the County.

V.     **CONCLUSION**

Having considered the briefing from the parties and the remainder of the record, the Court hereby finds and **ORDERS**:

(1) CMC's Motion for Summary Judgment (Dkt. No. 85) is **DENIED**.

(2) Warren County's Motion for Summary Judgment (Dkt. No. 83) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's state law claim against the County is **DISMISSED**.  Her ADA claim against the County will proceed to trial.

**SO ORDERED.**

Dated: February 23, 2026

Utica, New York

Anthony J. Brindisi
U.S. District Judge